[No. 31490. Department One. November 2, 1950.]

CARROLL CONSTRUCTION COMPANY, *Appellant*, v. THOMAS H. SMITH *et al.*, *Respondents.*[1]

*Crippen & Flynn*, for appellant.

*Louis J. Muscek* and *Marshall D. Adams,* for respondents.

BEALS, J.—Plaintiff Carroll Construction Company, a corporation, instituted this action against Thomas H. Smith (who, on the trial, testified that his name was Tomi H. Smith), doing business as Able Plumbing, and Olive May Smith, his wife, demanding judgment against defendants for the sum of $2,968.95, together with interest and costs, on account of an alleged breach of a subcontract to perform labor and install material (as part of a contract being performed by plaintiff) by the defendant husband, who will hereinafter be referred to as though he were the sole defendant in the action.

[1]Reported in 223 P. (2d) 606.

By his answer, the defendant admitted submitting a bid to accomplish the work, which was accepted by plaintiff, alleged part performance thereof, and, by way of a cross-complaint, pleaded that, after he had completed a portion of the work, the plaintiff breached the contract between the parties by refusing to make a payment due thereon, thereby compelling defendant to abandon the job. Defendant alleged that a balance of $482.45 was due him from plaintiff, for which amount he demanded judgment.

Plaintiff replied, denying the affirmative allegations contained in defendant's answer and cross-complaint.

The action was tried to the court, and a memorandum decision filed, to the effect that plaintiff was entitled to judgment for $38.60.

March 2, 1950, the plaintiff moved for judgment in its favor notwithstanding the court's memorandum decision and, the same day, also moved for a new trial. March 6th, the court entered findings of fact and conclusions of law following its memorandum decision and, March 10th, entered judgment in accordance therewith, awarding plaintiff judgment for the sum of $38.60. On the same day, the court entered an order denying plaintiff's motion for judgment in its favor notwithstanding the memorandum decision and denying defendant's motion for judgment in his favor upon his cross-complaint (that motion not appearing in the transcript).

March 20, 1950, the court signed an order stating that the matter came on for hearing "on various motions and orders dealing with denying" plaintiff's motion for judgment in its favor, the order further reciting that the court was of the opinion that the findings of fact, conclusions of law, and judgment theretofore entered had been "signed and entered by inadvertence and through misunderstanding," and declaring that the findings, conclusions, and judgment were "vacated in their entirety and set aside as null and void and of no effect." The order continued:

"It is further ORDERED that the order denying motion for judgment notwithstanding the Court's Memorandum Decision heretofore entered on March 10th 1950, and the order

vacating that order denying motions for judgment notwithstanding the Court's Memorandum Decision are also ordered stricken as having been signed through inadvertence and by virtue of irregularity and are declared to be vacated in their entirety and rendered null and void and of no effect.

"It is further ORDERED that the Court hereby is specifically vacating any and all orders and proceedings, Findings of Fact and Conclusions of Law, and Judgment, and in effect everything in the file and record of this case following the filing of the Memorandum Decision.

"It is further ORDERED that the Court having evidenced considerable question in its mind respecting its conclusions indicated in its Memorandum Decision, and having requested counsel to give further evidence to the Court respecting defendant's financial condition on or at the time of the business dealings with Carroll Construction Company herein involved, and plaintiff having furnished some evidence concerned therein by affidavit, now, therefore, the defendant is specifically given ten (10) days from March 20th, 1950, to file controverting affidavits if he so desires."

The court then fixed March 30, 1950, for a further hearing at which the court would announce its judgment in the action.

March 28th, the court signed an order reciting the presence of all parties before the court; that the court heard arguments from counsel for the respective parties; that defendant's motion to vacate "the order of this Court entered on March 20, 1950," was granted, and that that order "is hereby vacated." The order continued:

"That for the purpose of clarifying the record herein, and to make certain the status of orders heretofore entered, and vacated:

"IT IS FURTHER ORDERED That plaintiff's motion for a judgment notwithstanding the Court's Memorandum Decision is hereby denied.

"IT IS FURTHER ORDERED That defendants' motion for a judgment notwithstanding the Court's Memorandum Decision is hereby denied.

"IT IS FURTHER ORDERED That the Findings of Fact, Conclusions of Law, and the Judgment heretofore signed on March 10, 1950, which signing at said time may have been

premature, are hereby expressly approved, ratified and confirmed in all respects as of the date thereof.

"IT IS FURTHER ORDERED That plaintiff's motion for a new trial be, and the same is hereby denied."

March 31, 1950, plaintiff served and filed a written notice of appeal from the order entered March 28th, and from the judgment rendered by the court.

By its first five assignments of error, appellant contends that the trial court erred in making findings of fact Nos. 5, 6, 8, 9, and 10, and also

"(6) In entering judgment in the amount of $38.60.

"(7) In denying appellant's motion for judgment as prayed in its complaint notwithstanding the memorandum decision of the Court and in failing to grant a new trial.

"(8) In not entering judgment for appellant as prayed in its complaint."

It appears that for many years respondent had been engaged in business as a plumber in the city of Tacoma under the assumed name of Able Plumbing; that respondent's wife had sued him for a divorce, and that, when the contract between respondent and appellant was entered into, he was laboring under very considerable financial embarrassment.

It further appears that, July 22, 1949, appellant had been awarded a contract to construct a two-room addition to the Spanaway school district No. 322 schoolhouse, and that work was started under the contract a few days thereafter.

Respondent had met Mr. R. W. Hannum, appellant's vice-president, when he had submitted a bid on some plumbing work in connection with another construction job which was being carried on by appellant. Respondent was unable to take that contract for the reason that he could not procure a sufficient bond.

About the middle of August, Mr. Hannum and respondent discussed the plumbing work required by the contract for the addition to the Spanaway schoolhouse. Respondent examined the building, and Mr. Hannum testified on the trial that he furnished respondent with a copy of the plans and specifications showing the work to be done, as disclosed by appellant's exhibit No. 2, in which the plumbing specifica-

tions are shown on pages Nos. 8, 9, and 10. Mr. Hannum also testified that respondent said that he was short of money, and that the witness advised him that he could present a statement at the end of each month covering the work done up to that time.

It appears that appellant had contracted to install certain plumbing and also an appliance for heating. Respondent testified that he looked over the schoolhouse and there examined plans which he found on the job, and, from his examination of the plans, without considering the specifications, which he did not see, he telephoned to appellant a bid of eight hundred fifty dollars for installing the required plumbing. He further testified that Mr. Hannum stated that respondent would also be required to perform necessary labor on the installation of the heating appliance, and that he (respondent) then bid five hundred sixty-eight dollars for this work, after deducting one day's labor from his original bid because Mr. Hannum stated that the bid was too high. The plan or blueprint, upon which respondent testified that he based his bid, was admitted in evidence as appellant's exhibit No. 3. Respondent also testified that he saw no specifications until after he had started work on the job, and that he submitted a form of contract to Mr. Hannum, but that the latter said it was not necessary to use it as respondent would be paid as he needed money.

Mr. Hannum testified that a written bid, which was introduced in evidence as appellant's exhibit No. 4, was presented to appellant by respondent. Herbert Pinder, an officer of appellant, testified that he was present when respondent handed exhibit No. 4 to Hannum. This exhibit is written on respondent's letterhead, and is undated and unsigned, only the following words appearing thereon: "Plumbing & Heating will be done according to to [sic] (spc.) for the sum of $1419.31," followed by the words "plus 3% tax," through which a line has been drawn.

Mr. Hannum testified that exhibit No. 4 was the bid submitted by respondent and that, based upon that exhibit, respondent's bid was accepted and he commenced the work

shortly thereafter. Hannum testified that the letters "spc." appearing in exhibit No. 4 referred to the specifications contained in exhibit No. 2, which consists of lengthy specifications for the construction of the addition to the schoolhouse, evidently prepared by engineers employed by the school district.

Respondent testified that exhibit No. 4 was not in his handwriting, and that his bid of $1,419.31 was first made over the telephone and was followed by a "commitment bid" in the same amount which respondent wrote, signed, and handed to Mr. Hannum.

When his pretrial deposition was presented to respondent, indicating that a writing to the same effect as exhibit No. 4 had been shown to him and that he had identified the same as being in his handwriting, respondent stated that exhibit No. 4 was not the paper which had been so exhibited to him because the one which he identified bore his signature.

The reporter who took respondent's pretrial deposition testified that the wording on the paper exhibited to respondent was the same as the wording of exhibit No. 4, save that on exhibit No. 4 the word "to" is repeated.

It may be observed that a comparison of exhibit No. 4 with respondent's exhibit No. A, which he testified is in his handwriting, shows decided differences in the handwriting on the two exhibits.

Respondent testified that, by his bid of $1,419.31, he agreed to install the required standard plumbing in the schoolhouse (material and labor), and to install the heating equipment, but that his bid did not include any material for the heating job. Respondent further testified that not until August 25th or the following day did Hannum inform respondent that he was expected to furnish the material for the heating plant, and that there had been no previous discussion concerning materials to be used in connection with that portion of the installation. Respondent again stated that the only information he received concerning the specifications for the work upon which he bid was oral, and that he saw no written specifications until after he had completed the work, on ac-

count of which he asked for payment of three hundred dollars.

Mr. Stanley Shaw, an architect of many years' experience, was called by respondent and testified that frequently contractors did not insist upon great formality in connection with subcontracts; that such contracts were often entered into by subcontractors on oral bids, and that the work which respondent performed would be considered "a small job." Mr. Shaw further testified that a bid submitted in language equivalent to that contained in exhibit No. 4 would usually mean that the bid was submitted on written specifications, but that, if a contract were oral, "it might make a great difference."

Mr. Hannum testified that, about a week after respondent commenced work, the latter told the witness that he had made a bad bid and was not going to finish the job, further stating that Crane Company had given him an incorrect estimate on certain pipe that was required for the heating plant; that respondent then requested no payment, and that the witness had never received a written request for payment from respondent. The witness Pinder testified that, on one occasion, respondent came to appellant's office with a copy of the specifications, stating that he would need one thousand dollars more to complete the job, because of an error made by Crane Company in giving him an estimate.

Respondent testified that he left a written demand for payment of three hundred dollars on a desk in appellant's office, informing Pinder that he was leaving it there, and, further, that shortly thereafter he requested a payment from Hannum, who told him that he must proceed with the work before receiving any money. Respondent testified that he quit working about August 25th because he was not paid the three hundred dollars which he demanded. Respondent argued that he had performed four hundred eighty-five dollars' worth of work, including material, on the plumbing contract before he left the job.

The work was completed by Ace Plumbing and Heating Company for $888.60 for the plumbing only. The fact that it

was a rush job added somewhat to the cost. Apparently, the heating material and installation cost something over thirty-two hundred dollars.

The witness Shaw testified that a bid of six hundred dollars for accomplishing the labor on the heating installation would be very reasonable, and that a bid of one thousand dollars would be more logical.

In its complaint, appellant alleged that, to complete the plumbing and heating installations in the addition to the schoolhouse, it had been required to pay to the subcontractors the sum of $4,388.26, and, as above stated, demanded judgment against respondent for the sum of $2,968.95 by way of damages for alleged breach of contract.

Respondent was a plumbing contractor of many years' experience, and it is impossible to believe that, by his bid, he intended to assume the burden of supplying the material required to complete the heating installation. Of course, if respondent did make such a contract, he should be held liable thereon, regardless of whether he entered into the contract by reason of mistake or inadvertence.

Appellant assigns error upon the court's findings of fact Nos. 5, 6, 8, 9, and 10.

By finding No. 5, the court found that respondent's "bid was for the labor and materials on the plumbing in the sum of $850.00, and that he did agree to perform the labor only for the heating in the sum of $600.00"; that, when he submitted the bid, respondent was without funds even to pay helpers, and that he was to receive "progress payments during the job upon request made to the plaintiff [appellant]."

By finding No. 6, the court found that respondent "was not furnished with nor had he seen any specifications for the Spanaway school job at the time of submitting his bid or at the time of commencing the plumbing work or at any other time," but that he had obtained information concerning the plumbing and heating by talking to the foreman on the job and by examining plans in the foreman's possession, and that respondent based his written bid "on said consultation and studying of the plans."

By finding No. 8, the court found that respondent made demand upon appellant at the latter's office for the sum of three hundred dollars, as testified by respondent, and that payment was refused.

By finding No. 9, the court found that, upon refusal by appellant to make the payment to respondent, the latter ceased work; that appellant was forced to finish the plumbing installation in accordance with its contract, at a cost of $888.60, and that appellant should have judgment against respondent in the sum of $38.60, being the amount that appellant was required to pay over and above respondent's bid of eight hundred fifty dollars.

The court's finding No. 10 reads as follows:

"That there was no meeting of minds or contract either oral or in writing between the parties hereto in regard to the heating job on said school."

Several decisions of this court are of interest in connection with the questions here presented.

In the case of *Clarke v. Bohemian Breweries*, 7 Wn. (2d) 487, 110 P. (2d) 197, we held that evidence concerning the circumstances under which a contract between the parties was entered into was admissible. In the course of the opinion, we said:

"In excluding most of this evidence, the trial court erred, as it was competent for appellant to show the complete history of the rather informal dealings between the parties and the course of conduct adopted by them in connection with the work performed by the partnership for appellant, tending to show the construction of the contract by the parties. The evidence was admissible; of course its weight is a different matter."

Appellant contends that the trial court accorded too much weight to testimony introduced by respondent for the purpose of explaining the actual contract between the parties. Certainly it cannot be contended that appellant's exhibit No. 4 is not subject to explanation as to the intent of the parties.

■ In *Carnation Lbr. & Shingle Co. v. Tolt Land Co.*, 103 Wash. 633, 175 Pac. 331, this court, speaking through Chadwick, J., said (p. 639):

"The first and best resort in the construction of contracts is to put oneself in the place of the parties at the time the contract was executed—to look at it in prospect rather than in retrospect—for, when money disputes have arisen, the perspective is apt to be clouded by the unexpected chance of gain or self-interest."

In *Long-Bell Lbr. Co. v. National Bank of Commerce*, 35 Wn. (2d) 522, 214 P. (2d) 183, we cited the foregoing quotation with approval.

In 12 Am. Jur. 754, § 231, appears the following text:

"Stated in slightly different words, the language and acts of a party to a contract are to receive such a construction as at the time he supposed the other party would give to them or such a construction as the other party was fairly justified in giving to them, and he will not at a later time be permitted to give them a different operation in consequence of some mental reservation. Words which admit of a more extensive or more restrictive signification must be taken in that sense which will best effectuate what it is reasonable to suppose was the real intention of the parties. That interpretation should be adopted which, under all the circumstances of the case, ascribes the most reasonable, probable, and natural conduct to the parties. Business contracts must be construed with business sense as they naturally would be understood by intelligent men of affairs and in the same sense as is uniformly attached to them by the business world."

The evidence upon the principal question in the case, which we have briefly summarized, is conflicting. The court was required either to believe appellant's witnesses or to conclude that respondent's testimony was true. The record clearly indicates that the trial court devoted considerable time to a study of the evidence and, finally, by appropriate findings of fact and conclusions of law, decided the main issue in the case in favor of respondent, thereafter entering a judgment from which appellant has appealed.

■ We have repeatedly held that the findings of a trial court, entered upon disputed evidence, will be approved on

appeal to this court, unless the evidence clearly preponderates against them. Examination of the record convinces us that no such situation is here presented.

Appellant's assignments of error Nos. 6, 7, and 8, *supra*, are without merit, in view of our determination of the questions presented by the assignments above considered.

The judgment appealed from is affirmed.

SIMPSON, C. J., HILL, and GRADY, JJ., concur.

DONWORTH, J. (dissenting)—I am unable to agree with the majority opinion because I find no ambiguity in the written contract between the parties.

This is an action brought to enforce a subcontract in which no fraud was pleaded by the subcontractor (respondent) nor did he ask for a rescission or reformation thereof. He admits delivering to appellant the following written instrument:

"ABLE PLUMBING
8201 So. Tacoma Way — Lakewood 3440
Tacoma, Washington
"Plumbing and heating will be done according to spc. for the sum of $1419.31."

and that it referred to the construction of an addition to the Spanaway school.

He contends that the word "plumbing" meant the furnishing of all material and labor necessary according to plumbing specifications, but that the word "heating" meant the furnishing of labor *only* according to the heating specifications. I cannot find any legal basis for such a construction of this instrument.

The abbreviation "spc." incorporated by reference the specifications for the Spanaway school job (prepared by certain Seattle engineers) in so far as they related to the plumbing and heating requirements. 17 C. J. S. 773, Contracts, § 327 b(2).

These specifications (which were admitted in evidence) state that they are on file with the clerk of the school board

at the Spanaway school. Under the heading "General Conditions" is found this provision:

"*Scope of Work*:
"The work contemplated under this contract includes all labor, material, equipment and other items and services necessary for, and reasonably incidental to, the completion of the project described in the specifications and the accompanying drawings.
"The project consists of the following principal items:
(a) A 47′ x 56′ addition to the present frame building, including 2 classrooms, corridor and 2 entrances.
(b) Additional plumbing fixtures and minor alterations to the two existing toilet rooms.
(c) Moving 2 existing 20′ x 40′ frame buildings."

Under the heading "Plumbing for New Addition" is a detailed description of the new materials to be installed in the school addition together with a list of new plumbing fixtures required and a description of the alteration of existing fixtures.

Under the heading "Heating" is a paragraph reading:
"*Scope of Work*:
"This work shall include (a) an addition to the hot water heating system, including radiators, piping and circulating pump for the addition to the building; (b) a run of direct burial insulated hot water supply and return to the new location of the shop and (c) reconnecting the shop and library buildings at their new location."

Following this is a page devoted to a detailed description of the radiators, pipe, fittings, valves, pipe insulation and other heating materials to be installed in the new addition to the school.

Respondent testified that he did not see these specifications until after the delivery of the instrument above set forth. He said that, before bidding on this subcontract, he went to the school and talked to a carpenter (who was working on this job) who showed him a set of plans. However, these specifications were then available to him in the office of the clerk of the school board which was located in the school building. In any event respondent, having incorporated these specifications in his bid, is bound by the

provisions thereof relating to plumbing and heating whether or not he had previously read them.

In 17 C. J. S. 949, Contracts, § 459, the author states the obligation of a builder under such a contract to be:

*"Building and construction contracts.* In accordance with general rules governing other types of contracts, considered in previous paragraphs of this section, by the strict common-law rule, a builder who has improvidently assumed an absolute liability when he might have undertaken a qualified one only, is not excused from performing his engagement, unless he is prevented from doing so by reason of performance becoming impossible by a change in the law, see infra § 467, by the destruction of the specific thing which is essential to the performance of the contract, see infra § 466, or by the nonexistence of conditions essential to performance. No hardship, no unforeseen hindrance, no difficulty will excuse him from doing what he has expressly agreed to do. Thus, a contractor is not excused from performing according to the terms of the contract, because of defective or mistaken plans, of failure to agree on plans and specifications at the outset, or mere difficulty in performing, or of unusual or unexpected expense; or because of his inability to perform, not due to any wrongful act or omission of the owner; or because the contract would not be profitable to the owner, or would be useless under the existing conditions; nor is he excused because of latent defects in the soil conditions, unless the testing of the soil is exclusively within control of the owner or architect. So, also, the mere fact that after the builder has failed to perform his contract the owner notifies him that he will himself complete it does not show that the contractor was justified in his failure to perform."

Respondent's bid in this case was unqualified. To construe the bid, as the majority construes it, as being for labor and material with regard to the plumbing but for labor *only* with regard to the heating, seems to me to ignore the plain, unambiguous language of the instrument. If respondent intended to so limit his bid regarding the heating, he should have qualified it specifically in that respect.

It is argued by respondent that the figure ($1,419.31) was so absurdly low that appellant knew or should have known that he had miscalculated his bid. While appellant pro-

duced evidence to the contrary, the trial court found that there was no meeting of the minds as to the heating work and allowed appellant to recover $38 for respondent's breach of the plumbing portion of the contract. It seems to me that there is no logical basis for treating the two elements differently when the bid contained identical language as to both plumbing and heating.

While parol evidence is admissible to show the situation of the parties prior to the making of the contract for the purpose of placing the court in the same position as the parties, such evidence is not admissible to show an intent contrary to that expressed in the written agreement. On this point, we said in *Vance v. Ingram*, 16 Wn. (2d) 399, 133 P. (2d) 938:

"It is a well-established rule of construction that, when parties adopt a written agreement as the expression of their intentions, that instrument becomes the contract, and all negotiations and understandings previous thereto become merged into the agreement. Unless the contract as executed is ambiguous, or unless there exists some ground for rescission or reformation, the actual unexpressed intentions of the parties may not be considered to alter the terms of the written document. The fact that a party may have believed the effect of the agreement to be different than it actually is, will not in and of itself, justify this court in setting aside or rewriting the contract for them.

"One further rule of construction should be mentioned. The court may always consider the surrounding circumstances leading up to the execution of an agreement, not to evidence an intent contrary to that expressed in the agreement, but to place the court in the same position as the parties. 3 Williston on Contracts (Rev. ed.) 1804, § 629; *Leavenworth State Bank v. Cashmere Apple Co.*, 118 Wash. 356, 204 Pac. 5."

The majority opinion, contrary to the above quoted rule, considers the parol evidence admitted by the trial court regarding the preliminary negotiations between the parties and, adopting its findings of fact, holds that the terms of the unambiguous written instrument (which was the final integration of the negotiations between the parties) shall

be varied and given a different meaning than the words used therein plainly mean.

Respondent may have made a bid which was much too low, but he has shown no legal or equitable ground for relieving him from the obligations which he, a plumber of twenty-two years experience, assumed by delivery of the written instrument to appellant.

I think that the judgment should be reversed, and the cause remanded to the trial court with instructions to grant appellant judgment for the amount prayed for in its complaint.